**Shirl PETTRO, Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 96–651L.

United States Court of Federal Claims.

July 11, 2000.

Allen K. Young, Young, Kester & Petro, Springville, UT, attorney of record for plaintiff; Michael J. Petro, Young, Kester & Petro, of counsel.

Pamela S. West, Environmental & Natural Resources Division, United States Department of Justice, Washington, D.C., for defendant.

## OPINION

HORN, Judge.

This matter comes before the court on plaintiff Shirl Pettro's claim that he is entitled to just compensation under the Fifth Amendment of the United States Constitution for a temporary taking of certain mineral rights by the defendant, the United States. After careful consideration of the record, the parties' filings, and the relevant law, the court finds that the defendant temporarily took plaintiff's property when, for portions of three years, the United States Forest Service prevented plaintiff from exercising his right to remove sand and gravel from his property in Utah County, Utah. The court further holds that, as just compensation, plaintiff is entitled to the fair market rental value of the property, but not the lost profits which he claims he allegedly would have made from the sale of gravel during the taking period.

### FINDINGS OF FACT

The plaintiff, Shirl Pettro, a resident of the state of Utah, filed a complaint before this court alleging that actions of the defendant United States "resulted in a temporary and/or permanent and substantial interference with plaintiff['s] use and enjoyment of [his] land, amounting to a taking of an interest in plaintiff['s] property without compensation, in violation of the Fifth Amendment of the United States Constitution."[1] The property at issue (the Pettro pit) is an irregularly shaped, rectangular-like parcel, located in Utah County, Utah, which the plaintiff operates as a sand and gravel pit. The property lies within the Uinta National Forest, in the NW4 of Section 21 of Township 7 South, Range 3 East, Salt Lake Basin and Meridian.

---

1. The original plaintiffs in this case were Shirl Pettro and his son, Scott Pettro. However, on August 18, 1998, upon the motion of Shirl and Scott Pettro, the court dismissed, with prejudice, the claims of Scott Pettro.

The Pettro pit's history is long and complicated. Originally, on March 28, 1914, three of the aliquot parts of Section 21 (NWNW, NENW, SENW) which overlap the Pettro pit were selected by the State of Utah as indemnity school selections and conveyed to the state by the United States.[2] The State of Utah, on November 18, 1918, then sold the three aliquot parts and other property within Township 7 South, Range 3 East to the Knight Investment Company.

By June of 1936, the Knight Investment Company was in receivership. On June 8, 1936, Leon Newren, Receiver for the Knight Investment Company, conveyed by quit-claim deed an interest in property to Colorado Development Company. Included among the property conveyed was "the East half of the Northwest quarter; and the Northwest quarter of the Northwest quarter of Section 21." The quit-claim deed, however, reserved to the Knight Investment Company "all oil, gas, valuable ores, minerals and precious metals ...." Subsequently, the United States of America acquired an interest in much of the property which had been quit-claimed to Colorado Development Company.[3] This acquisition included all of the NENW aliquot part of Section 21, and all but an excluded parcel of the SENW and NWNW aliquot parts of Section 21. The deed from Colorado Development Company to the United States included several reservations, one of which stated:

> 9. ALSO EXCEPTING from all of said property all oil, gas, valuable ores, minerals and precious metals, including gold, silver, lead, cinnabar, copper and other metals, with full power in the Knight Investment Company, its successors and assigns, to take all usual, customary, proper or convenient means for prospecting for, mining or removing any such oil, gas or minerals.

Consistent with the Knight Investment Company's reservation of the mineral rights in the property, on March 11, 1938, a Utah state court authorized Mr. Newren, still acting as Receiver for the Knight Investment Company, to contract with two individuals for the removal of sand and gravel from the property on a royalty basis. On January 10, 1947, Mr. Newren deeded an interest in Sections 21 and 22 to J. William Knight. With respect to the property noted, by the terms of the deed, J. William Knight acquired the following:

> all mines and minerals, oil and gas, deposits of limestone, slate, gravel, or any other deposits of commercial value, upon or under the property hereinafter described, with full power to take all usual, customary, proper, or convenient means for prospecting for, mining, or removing any such minerals, oil, or gas, or deposits of any kind from the same; provided, however, that the grantee, his heirs and assigns, shall pay a reasonable compensation to the owner of the fee simple title to the surface rights for any surface ground used or damaged in the course of any such operations.

As stated by the plaintiff, "[t]he mineral right property was essentially the same property [to which] Mr. Newren had quit claimed the surface rights to Colorado Development in 1936." J. William Knight and Jennie Knight, in turn, then conveyed the "mineral rights" to Paul Petrofera and Roxey Petrofera on April 8, 1949. A few days later, Paul Petrofera was granted a Special use permit from the United States Forest Service to process gravel.[4]

On August 20, 1970, Paul Petrofesa and Roxey Petrofesa,[5] and their wives conveyed their rights in the property by quit-claim deed to Shirl Pettro and his wife, Marilyn

---

2. The Pettro property does not include any lands within the SWNW of Section 21.

3. On July 27, 1934, President Franklin D. Roosevelt issued a withdrawal order of certain lands for inclusion in the Uinta National Forest in Utah. The withdrawal order included lands in the NWNW, NENW and SENW aliquot parts of Section 21. Later, by the Act of August 26, 1935, Congress authorized the Secretary of Agriculture to acquire lands "within the boundaries of the Uinta and Wasatch National Forests, in the State of Utah . . . ."

4. The special use permit also was issued to Louis Petrofera.

5. No explanation has been given for the change in surname to Petrofesa of Paul and Roxey Petrofera in subsequent documents. In any event, neither party claims that different individuals are being referenced.

Pettro. Commencing in approximately 1975, the exclusive use of this property, the Pettro pit, became the intermittent sale of sand and gravel to contractors on a royalty basis. On September 23, 1981, Shirl and Marilyn Pettro, through the execution of another quitclaim deed, caused their interest in the property to be held solely by Shirl Pettro.

The Pettro pit was periodically inspected by Forest Service personnel checking for compliance with the terms of the Special use permit. After one of these inspections, Robert Easton, the District Ranger for the Pleasant Grove Ranger District of the Uinta National Forest, wrote to Shirl Pettro on July 28, 1989 and informed him that it was necessary that he remove equipment which was being stored at the pit. On February 27, 1991, Mr. Easton again wrote to plaintiff with a more detailed explanation of the Forest Service's intentions and requirements. The letter stated:

As part of an ongoing process, the Pleasant Grove Ranger District is updating and renewing our older special use permits. The special use permit which authorizes you to exercise your mineral reservation on National Forest System land is dated 1957. Our plans were to issue a new permit with updated clauses this winter.

However, after inspecting your gravel pit on January 31, we found the area to be in violation of the terms of your surface occupancy specified in the existing permit, and which would be part of a new permit if it were issued. As in our inspection performed in 1989, we found numerous metal machinery parts, tractor chassis, other unusable debris, and scattered 55 gallon drums apparently containing oil or some other petroleum product. Either the drums have leaked in the past or oil has been spilled as evidenced by the stains on the soil. It appears that much of this machinery and other material is not being used for the operation of your sand and gravel operation, and that it has not been moved or operated since our inspection in 1989. It appears that most of this material is simply being stored at the site rather than serving a useful purpose.

As you know, while you have a mineral reservation for sand and gravel from this area, the land is part of the National Forest System and the Forest Service is responsible for managing the land surface. Clause number 4 of the Special Use Permit with the Forest Service states "The permittee shall maintain the improvements and premises to standards of repair, orderliness, neatness, sanitation, and safety acceptable to the forest officer in charge." We do not feel it is proper to issue a new special use permit until these conditions are met. This would require a removal of the material mentioned above....

The letter also indicated that failure to comply would result in termination of the special use permit.

On December 6, 1991, Peter Karp, the Forest Supervisor for the Uinta National Forest, transmitted a new Special use permit to plaintiff. The transmittal letter stated that the new permit was "for occupancy to exercise a reserved mineral right on the Uinta National Forest."

According to the plaintiff, in the early 1990s, a committee was formed to design and create a hiking trail, which was to extend north from Nephi, Utah, to Brigham City, Utah. The trail was to follow the historic shoreline of the now nonexistent Lake Bonneville. The committee consisted of representatives from the communities through which the trail would pass. The Forest Service took a leadership role in the creation and development of the trail, which would be known as the Bonneville Shoreline Trail.

By 1995, it had been determined that one possible route of the trail would pass along the hills above the Pettro pit, and another possible route would go through the middle of the pit. Gerrish Willis, a Forest Service real estate specialist for the Uinta National Forest, and his direct supervisor, Robert Easton, both were concerned about the effect that gravel removal in the Pettro pit might have on the trail. In the summer of 1995, Mr. Willis initiated a title search on the Pettro pit. At trial, Mr. Willis explained the reasons for his action:

There were special use permit compliance problems with Mr. Pettro's special

use permit associated with his sand and gravel operation on the national forest. The District Ranger was concerned about getting compliance.

I realized that there, not only in this area but many areas along the Wasatch Front where the Forest Service had reacquired property that had gone out of public domain, that there were questions about the estate, the bundle of sticks that the United States had acquired.

I think at that time I was probably aware that the mineral estate was not part of the bundle of sticks that we'd acquired, and I advised Mr. Easton that in order to do a thorough job of figuring out what Mr. Pettro's rights were as a property owner and an owner of an interest in a property that the United States owned, that it would be best to find out exactly what his interest was prior to taking any action on a special use permit.

The reason for doing that is as a private property owner Mr. Pettro has rights, and I advised Mr. Easton that we wanted to be very careful about making sure that everything that we were doing was within the authority that we had.

I realized that there could have been rights that were overlooked as the special use permit was prepared in the first place, and to make sure that any action that Mr. Easton took would be based upon what the United States['] interest was in the land.

On August 2, 1995, Robert Easton wrote to plaintiff concerning his special use permit for excavating sand and gravel. In the letter, Mr. Easton informed Shirl Pettro of the following:

6. If the property transfer from Knight Investment Company to Jackson did occur, this lends credibility to the argument that the United States gained the sand and gravel rights for the property, along with the surface rights, from Colorado Development Company. However, neither party provided the court with a copy of the purported 1930 conveyance to Jackson, nor has the court seen any documentation of a foreclosure sale by which the Colorado Development Company allegedly later took possession of Jackson's holdings in the property. Without these materials, it is difficult for the court to assess the validity of Mr. Paur's title opinion.

We are reviewing the status of special use permits on the Pleasant Grove District. That review indicates that the conditions of the permit issued to you on February 14, 1992 are not being met. Specifically, item # 4 which required a development plan approved in advance for activities at the site. And item # 12 which required that the permittee restore National Forest System property (in this case the surface estate) upon completion or abandonment of the project. Apparently there is no plan or mechanism to ensure this criteria [sic] is met.

Tom King [the owner and operator of River City Rock, a company which had been mining in the Pettro pit] indicated that he intended to do excavation work on the site per a business agreement with you. Prior to any work on site by any party a plan for activities on site and reclamation must be approved. Please don't hesitate to contact me if you have questions concerning your special use permit or activities on National Forest System Lands.

Shortly thereafter, on August 18, 1995, at the request of the Forest Service, Kenneth Paur, an attorney with the Office of General Counsel, United States Department of Agriculture issued a title opinion on the gravel rights for the Pettro pit. The opinion stated that there was a Knight Investment Company quit-claim conveyance in 1930 to a party named Jackson, and that this conveyance reserved minerals and gravel. When the Knight Investment Company quit-claimed its remaining interest in the property to Colorado Development Company in 1936, it reserved only minerals. Thus, Paur believed that title to gravel had passed to Colorado Development Company, who later passed the title to the United States.[6]

Regardless, it is unnecessary for the court to examine this matter further, because, as noted *infra*, a pertinent settlement agreement between the parties establishes that Shirl Pettro possessed the sand and gravel rights during the periods of the alleged taking in this case. Furthermore, as also discussed *infra*, any claim by the defendant that it was acting under a good-faith belief of rightful ownership to the sand and gravel is not dispositive to the question of whether a taking occurred.

On August 24, 1995, based on this title opinion, the Forest Service wrote to plaintiff and instructed him to cease work at the pit. The letter, signed by Dave Stricklan for Robert Easton, read in pertinent part:

The purpose of this letter is to inform you that we have done a title review of the mineral estate on the land covered by your mineral reservation. That chain of title search indicates that title to gravel in the subject property was merged with the surface estate in 1936, and conveyed to the United States with the surface estate by the Colorado Development Co.

Accordingly I am instructing you to cease all work on the site, remove all structures, equipment and materials, and to restore the site per term #12 of your special use permit. . . .

Plaintiff disputed the Forest Service's claims, and, through his attorney, notified the Forest Service of his position on September 18, 1995. Plaintiff's attorney stated, "It does not appear that the title to gravel was conveyed to the United States by Colorado Development Company . . . ."

In late 1995, Shirl Pettro agreed to sell gravel from his pit to both Mike Dunn of Dunex, Inc.[7] and Ron Knight of Valley Asphalt on a royalty basis of 75 cents per ton. Plaintiff and Mr. Dunn agreed that Dunn would remove 23,000 yards, which equaled 40,250 tons based on a material analysis performed for Dunn by an engineering firm. Dunex, Inc. planned to use the material for a low income housing construction project south of the Provo Cemetery. Plaintiff and Mr. Knight agreed that Valley Asphalt would remove material to use in building a dike for a safety zone at the Provo airport. Valley Asphalt intended to remove approximately 200,000 tons of sand and gravel.

In January of 1996, Dunex, Inc. moved equipment to the Pettro pit in preparation for the start of gravel removal operations. On January 16, 1996, Dave Stricklan of the Forest Service informed Dunex workers at the Pettro Pit and Mike Dunn himself that they should not remove any material from the pit due to the Forest Service's title dis-

pute with Shirl Pettro. Mr. Dunn asked that the substance of his conversation with Mr. Stricklan be put in writing. The next day, January 17, 1996, Forest Service Special Agent Dave Griffel hand-delivered a letter to Mr. Dunn which instructed Dunex, Inc. to cease all excavation and removal activity at the Pettro pit. The letter, from Robert Easton, informed Mr. Dunn that the United States held title to the gravel, and instructed him "to cease all work on the site and to remove all structures and equipment." The letter also alerted Mr. Dunn that he could be responsible for a portion of the site rehabilitation cost if he continued to excavate the site. Dunex removed no material from the Pettro pit after receiving Easton's letter, and the company removed its equipment from the site about a week later.

Similarly, on January 19, 1996, Special Agent Griffel hand-delivered a copy of a letter to Mr. Knight. This letter from Robert Easton was dated January 19, 1996, and was addressed to Shirl Pettro and his son, Paul. The letter stated:

On August 24, 1995 we sent you a letter instructing you to cease removing rock, sand, and gravel from the pit on National Forest System land in T.. 7 S.R. 3 E. Section 21 in Ironton, Utah. It is our opinion that the sand and gravel deposits are owned by the United States and that you have no authority to remove it or to authorize others to remove it.

On January 16, 1996 we discovered that DUNNEX, Inc. [sic] had moved heavy equipment into the pit and was preparing to remove 26,000 cubic yards of material. We have ordered Mr. Dunn to cease and desist and to remove his equipment from the area. On January 18, 1996 we met Mr. Ron Knight from Valley Asphalt of Spanish Fork who said they were preparing to remove 200,000 cubic yards from the pit. We advised him of our opinion about the ownership of the material.

You and others under your control will be held liable for any additional removal from this pit. If mining in the pit continues, the

---

7. The record contains multiple different spellings: Dunex, Dunnex, and Dunix. For the sake of convenience, the court will use Dunex in this opinion.

Forest Service will take appropriate measures to protect the United States' interests.

After receiving a copy of this letter, Valley Asphalt made no attempt to remove any material from the Pettro pit.

Believing that the United States held title to the gravel at the Pettro pit, the Forest Service then began the process of revoking Shirl Pettro's special use permit. On March 8, 1996, the Uinta National Forest Supervisor, Peter Karp, wrote to Shirl and Paul Pettro and told them that he planned "to take action to revoke [their] special use permit." They were instructed to provide evidence, within ten calendar days, of good cause as to why the Forest Service should not revoke the permit. After receiving no reply from plaintiff, the Forest Service revoked the permit in a letter sent on April 10, 1996. The revocation decision, however, was subject to administrative appeal, and plaintiff exercised his right to appeal the decision on May 17, 1996.

On July 8, 1996, the United States of America brought suit against Shirl and Scott Pettro in the United States District Court, District of Utah, Central Division. According to the Complaint, it was a "civil action brought by the United States of America to quiet title to certain real property in which defendants [Scott and Shirl Pettro] claim an interest, to recover damages to compensate it for defendants' past ground disturbing activities, and to require that defendants restore the property." Shirl Pettro counterclaimed that he owned all of the property's mineral rights, including those to the sand and gravel, pursuant to pertinent deeds and records.

After almost two years of litigation, the parties arrived at a stipulation resolving the issues raised in the government's complaint.[8] Among the provisions, the parties stipulated that:

As of August 24, 1995, defendant Shirl Pettro was the owner of and held legal and equitable title to the mineral estate on the property that is described in the attached Exhibit "A" [the Pettro pit], which mineral estate included sand and gravel. Pettro's ownership interest in and legal and equitable title to that mineral estate continued until October 3, 1997. By agreement of the parties, Pettro's ownership ceased from October 3, 1997 through March 5, 1998. It began again on March 5, 1998 and continued through the date of this Agreement.

Thus, at the time of the Forest Service's issuance of cease and desist letters to Shirl Pettro, Mike Dunn, and Ron Knight, the parties agreed that Shirl Pettro held title to the sand and gravel at the Pettro pit. Upon its effective date, the Stipulation effectively divided the property at issue into two sections which would be separated by a fence to be constructed by plaintiff. Plaintiff would hold full fee title to one 22.99 acre section, and the United States would hold full fee title to the other 36.71 acre section. On June 29, 1998, the United States District Court for the District of Utah issued an "ORDER QUIETING TITLE AND DISMISSING ACTION" which implemented the terms of the parties' settlement agreement and dismissed the government's complaint.

Plaintiff subsequently filed his complaint in this court. Plaintiff specifically noted the Forest Service's August 24, 1995 letter requiring him to cease action at the Pettro pit, and stated that "[s]ince that time, the United States Forest Service has demanded that the [plaintiffs[9]] cease removal of sand and gravel from the property, remove all structures, equipment and materials related to sand and gravel operations, and reclaim the site to restore and stabilize the excavation." Plaintiff alleges that the Forest Service had no authority to do this, and that defendant's actions "resulted in a temporary and/or per-

8. The stipulation was entered into on or before May 21, 1998 and signed by the parties between May 21, 1998 and June 3, 1998. The quiet title action, however, was not judicially implemented until an "Order Quieting Title and Dismissing Action" was filed on June 29, 1998 in the United States District Court for the District of Utah. However, there is no dispute between the parties that the end date for any taking is considered to be May 21, 1998.

9. As noted earlier, *see supra* note 1, the Complaint as filed originally listed two plaintiffs, Shirl and Scott Pettro.

manent and substantial interference with plaintiffs' use and enjoyment of their land, amounting to a taking of an interest in plaintiffs' property without compensation, in violation of the Fifth Amendment of the United States Constitution." Plaintiff also alleged that he was unable to fulfill several contracts as a direct result of defendant's actions, and he sought compensation for the loss of this interest. A trial subsequently was held on both the issues of liability and damages.

### DISCUSSION

Plaintiff, Shirl Pettro, has brought a Fifth Amendment takings claim against defendant, alleging a temporary taking of his property during two periods: from January 16, 1996 to October 3, 1997, and from March 5, 1998 to May 21, 1998. The Takings Clause of the Fifth Amendment to the United States Constitution provides in pertinent part: "nor shall private property be taken for public use without just compensation." U.S. Const. amend. V. The purpose of the Fifth Amendment is "to prevent the government 'from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" *Eastern Enters. v. Apfel,* 524 U.S. 498, 118 S.Ct. 2131, 2145, 141 L.Ed.2d 451 (1998) (quoting *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960)); *accord Janowsky v. United States,* 133 F.3d 888, 892 (Fed.Cir.1998); *Florida Rock Indus., Inc. v. United States,* 45 Fed. Cl. 21, 24 (1999). There is a "clear principle of natural equity that the individual whose property is thus sacrificed [for the public good] must be indemnified." *Pumpelly v. Green Bay & Mississippi Canal Co.,* 13 Wall. 166, 80 U.S. 166, 179, 20 L.Ed. 557 (1871).

The Tucker Act grants the United States Court of Federal Claims jurisdiction to entertain claims alleging that the government has taken private property for public use in violation of the Fifth Amendment of the United States Constitution. The United States Supreme Court has declared: "[i]f there is a taking, the claim is 'founded upon the Constitution' and within the jurisdiction of the [Claims Court] to hear and determine." *Preseault v. ICC,* 494 U.S. 1, 12, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990) (quoting *United States v. Causby,* 328 U.S. 256, 267, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946)); *see Narramore v. United States,* 960 F.2d 1048, 1052 (Fed.Cir.1992); *Perry v. United States,* 28 Fed.Cl. 82, 84 (1993).

■ A takings claim requires a two-step analysis in which a court first determines whether a plaintiff possesses a valid property right affected by governmental action, and then, if the plaintiff does possess a compensable property right, the court decides if the governmental action at issue constituted a taking of that right. *Karuk Tribe of Cal. v. Ammon,* 209 F.3d 1366 (Fed.Cir.2000), 209 F.3d 1366, 1374 (Fed.Cir.2000). A takings plaintiff must have a legally-cognizable property interest, *Skip Kirchdorfer, Inc. v. United States,* 6 F.3d 1573, 1580 (Fed.Cir.1993), such as the right of possession, use or disposal of the property. *See Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 435, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) (citing *United States v. General Motors Corp.,* 323 U.S. 373, 378, 65 S.Ct. 357, 89 L.Ed. 311 (1945)); *Karuk Tribe of Cal. v. Ammon,* 209 F.3d 1366, 1374–75. As well, the right of exclusion from the property "has traditionally been considered one of the most treasured strands in an owner's bundle of property rights". *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. at 435, 102 S.Ct. 3164.

■ If a plaintiff has a valid property interest, the government "takes" that interest by destroying, physically occupying, or excessively regulating it for a public purpose. *Boyle v. United States,* 200 F.3d 1369, 1374 (Fed.Cir.2000). Consistent with this notion, the United States Supreme Court has noted that most takings cases fall within two distinct classes:

Where the government authorizes a physical occupation of property (or actually takes title), the Takings Clause generally requires compensation. But where the government merely regulates the use of property, compensation is required only if considerations such as the purpose of the regulation or the extent to which it deprives the owner of the economic use of the property suggest that the regulation

has unfairly singled out the property owner to bear a burden that should be borne by the public as a whole. The first category of cases requires courts to apply a clear rule; the second necessarily entails complex factual assessments of the purposes and economic effects of government actions.

*Yee v. City of Escondido, Cal.,* 503 U.S. 519, 522–23, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992) (citations omitted); *accord Abrahim–Youri v. United States,* 139 F.3d 1462, 1465 (Fed.Cir.1997) (physical takings are "based on an outright governmental seizure or occupation of private property," while regulatory takings are "based on a regulatory imposition that constrains an owner's continuing use of property"), *cert. denied,* 524 U.S. 951, 118 S.Ct. 2366, 141 L.Ed.2d 735, *reh'g denied,* 524 U.S. 970, 119 S.Ct. 14, 141 L.Ed.2d 775 (1998).

 In the first class of physical occupations, even if the government's action falls short of a formal, physical invasion of a plaintiff's property, there may still be a taking of that property, by inverse condemnation, "where government action has destroyed the owner's use and enjoyment of his property thereby depriving the owner of all or most of his interest in the property." *See Yuba Natural Resources, Inc. v. United States,* 821 F.2d 638, 640 (Fed.Cir.1987) (*Yuba IV*) [10]; *see also Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1014, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) (noting the functional equivalence between a "practical ouster" of an owner's possession and a "direct appropriation" of that property). Thus, takings do not necessarily require physical invasion by the government or physical restraint of a plaintiff's use of property. *Yuba Goldfields, Inc. v. United States,* 723 F.2d 884, 887 (Fed.Cir.1983) (*Yuba II*). In addition, once a taking has occurred, subsequent actions by the government cannot relieve it of the obligation to compensate a property owner for the period during which the owner's rights were abridged. *Tabb Lakes, Ltd. v. United States,* 10 F.3d at 800 (citing *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles,* 482 U.S. 304, 321, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987)).

In the present case, whether Shirl Pettro possesses a valid property right is the question which brought about the chain of events leading to this lawsuit. The planned Bonneville Shoreline Trail was to pass above the Pettro pit, and the Forest Service was concerned that gravel removal in the pit might affect the trail. Plaintiff alleges that this was the sole concern which led the Forest Service to initiate its title search on the Pettro property. The title search, conducted by a U.S. Department of Agriculture attorney, concluded that the United States, rather than Shirl Pettro, held title to the mineral rights in the property. Based on this opinion, the Forest Service instructed plaintiff, on August 24, 1995, to cease all work in the pit. Plaintiff disputed the Forest Service's title claims, and agreed to sell material from the pit to two contractors. The Forest Service, however, ordered plaintiff's contractors, on January 16 and 19, 1995, to cease all work and to remove their equipment from the pit, or potentially to become liable for damages. This forced stoppage of work forms the basis of plaintiff's takings claim. Plaintiff argues:

> Because of the actions of the defendant, Shirl Pettro was deprived of his right to extract minerals from his mineral estate, one of the most essential rights in property. Plaintiff has shown that his property rights were directly infringed. He has also shown that the government's actions denied him of all economic use of his property. Therefore, according to the Fifth Amendment, Shirl Pettro must be justly compensated.

---

**10.** The United States Supreme Court has explained:

> Inverse condemnation should be distinguished from eminent domain. Eminent domain refers to a legal proceeding in which a government asserts its authority to condemn property. Inverse condemnation is "a shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted."

*Agins v. City of Tiburon,* 447 U.S. 255, 258 n. 2, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980); *accord Tabb Lakes, Ltd. v. United States,* 10 F.3d 796, 800 & n. 3 (Fed.Cir.1993).

While a dispute over title to the sand and gravel rights in the Pettro pit precipitated the takings claim in this case, it is unnecessary for this court to decide who holds such title. This is a result of the settlement agreement into which the parties entered to end the quiet title action first brought by the government on July 8, 1996 in the United States District Court for the District of Utah. According to the settlement stipulation, at the time of the alleged January 16, 1996 initiation of the taking, Shirl Pettro held title to the mineral estate. The first paragraph of the parties' stipulation states:

As of August 24, 1995, defendant Shirl Pettro was the owner of and held legal and equitable title to the mineral estate on the property that is described in the attached Exhibit "A" [the Pettro pit], which mineral estate included sand and gravel. Pettro's ownership interest in and legal and equitable title to that mineral estate continued until October 3, 1997. By agreement of the parties, Pettro's ownership ceased from October 3, 1997 through March 5, 1998. It began again on March 5, 1998 and continued through the date of this Agreement.

Thus, it has been established that, at the inception of the alleged taking, plaintiff possessed a valid property right to extract minerals from the area known as the Pettro pit. It is also clear that there is governmental action which involved the Pettro pit. That action was the issuance by the Forest Service, to the plaintiff and his contractors, of cease and desist letters and orders regarding mining activities at the pit. These facts demonstrate that plaintiff has met the first of two takings claim requirements as enunciated in *Karuk Tribe of Cal. v. Ammon,* namely, that "plaintiff possesses a valid interest in the property affected by governmental action." *See* 209 F.3d at 1374.

█ In order for plaintiff's claim to prevail, however, the court must also find that the governmental action at issue constituted a taking of plaintiff's property right. *See id.* As noted earlier, there are primarily two classes of takings claims: (1) physical, or per se, takings, and (2) regulatory takings. *See Yee v. City of Escondido, Cal.,* 503 U.S. at

522–23, 112 S.Ct. 1522. These different classes call for different analytical approaches. *Abrahim–Youri v. United States,* 139 F.3d at 1465 (comparing the regulatory takings analysis in *Penn Central Trans. Co. v. New York,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) with the physical takings analysis in *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. at 419, 102 S.Ct. 3164). The regulatory takings analysis calls for a court to examine three separate criteria: (1) the character of the government action, (2) the economic impact of the regulation on the claimant, and (3) the extent to which the regulation interferes with distinct investment-backed expectations of the property owner. *Penn Central Trans. Co. v. New York,* 438 U.S. at 124, 98 S.Ct. 2646; *Creppel v. United States,* 41 F.3d 627, 631 (Fed.Cir. 1994).

█ Defendant in this case has expended considerable effort attempting to show that the Forest Service's actions, when examined under the *Penn Central* criteria, do not evidence a taking of Shirl Pettro's mineral rights. This effort is consistent with the Supreme Court's observation in *Yee v. City of Escondido, Cal.* that a regulatory takings analysis "necessarily entails complex factual assessments of the purposes and economic effects of government actions." 503 U.S. at 523, 112 S.Ct. 1522. The court, however, agrees with plaintiff that defendant's efforts are misguided, because this case is not a regulatory takings case. The value of plaintiff's property was not reduced by the implementation or application of a federal regulation. In contrast, the Forest Service requested a title search which led the government to believe that it was the real owner of plaintiff's sand and gravel rights, and it then proceeded to file a quiet title suit seeking judicial validation of its opinion after ordering work at the site to cease. The United States actively attempted to take plaintiff's property as its own, and, therefore, the Forest Service's actions should be analyzed under the law applicable to physical takings.

█ The government physically "takes" a property interest by destroying or occupying it. *See Boyle v. United States,* 200

F.3d at 1374. In this case, defendant never actually removed or attempted to remove any minerals from the Pettro pit. Thus, upon initial examination, it might seem that no taking had occurred. However, the defendant tried to establish ownership, not through eminent domain, of the property in question, and as the United States Court of Appeals for the Federal Circuit has noted, even if the government's action falls short of a formal, physical invasion of a plaintiff's property, there may still be a taking of that property, by inverse condemnation, if the action deprives the owner of all or most of his property interest. *See Yuba IV*, 821 F.2d at 640.

 Such a deprivation of use of property is apparent here. On August 24, 1995, after receiving the results of the government's title search, the Forest Service wrote to Shirl Pettro and informed him that title to the gravel had merged with the surface estate in 1936, and had been conveyed to the United States with the surface estate by the Colorado Development Company. In the letter, District Ranger Robert Easton stated, "I am instructing you to cease all work on the site, remove all structures, equipment and materials, and to restore the site per term # 12 of your special use permit." Subsequently, two of plaintiff's contractors began preparations to remove gravel from the pit pursuant to agreements they had made with plaintiff. On January 16, 1996, a Forest Service official confronted one of the contractors, Mike Dunn, and ordered him to abstain from removing any material from the pit and to remove his equipment from the pit, or face damages if work continued. This order was formalized the next day in a hand-delivered letter which instructed Mr. Dunn "to cease all work on the site and to remove all structures and equipment." On January 18, 1996, similar instructions were given verbally by the government to the other contractor, Ron Knight of Valley Asphalt. On January 19, 1996 a Forest Service official presented to Ron Knight a copy of a letter from Robert Easton. The letter, addressed to Shirl Pettro, restated the Forest Service's belief that the government held title to the mineral estate, and summarized the Forest Service's actions of the prior days which prevented removal of material from the pit. The letter ended with a clear threat: "You and others under your control will be held liable for any additional removal from this pit. If mining in the pit continues, the Forest Service will take appropriate measures to protect the United States' interests."

The Forest Service's actions had a direct effect on plaintiff and on his contractors. After receiving the verbal warnings and cease and desist letters from the Forest Service, Mike Dunn removed his equipment from the Pettro pit and attempted no removal of any material. He obtained gravel from another nearby site in order to complete an ongoing project. Mr. Dunn testified at trial that he vacated the Pettro pit solely as a result of the Forest Service's warnings. Similarly, after receiving the Forest Service's cease and desist letter to Shirl Pettro, Valley Asphalt made no attempt to remove any material from the Pettro pit. Ron Knight stated at trial that he feared a possible lawsuit by the Forest Service. Shirl Pettro testified that he, too, feared legal action by the Forest Service if he removed any material from his pit, and, therefore, he made no attempt to exercise his mineral rights after receiving the Forest Service's January 19, 1996 letter.

Plaintiff argues that the Forest Service's actions deprived him of all economic use of his property, and the court agrees. By stipulation of the parties in the quiet title action, at the time when plaintiff's contractors were ordered to cease activities at the Pettro pit, Shirl Pettro held title only to the sand, gravel, and mineral rights for the site. Prevented from removing those materials by the Forest Service, plaintiff's ability to make use of his property interest effectively had been destroyed. While the rights eventually were given back to the plaintiff through the resolution of the government's quiet title suit, the fact remains that plaintiff could not act upon those rights from January 16, 1996 until the quiet title suit settlement stipulation was executed on May 21, 1998.[11] While the defen-

---

11. For the purpose of settling the quiet title suit,

however, the parties have stipulated that Shirl

148

dant never attempted to remove any material from the site during the period in question, the government's words and actions indicated to all involved that the United States considered itself the owner of the sand and gravel rights. Thus, the court holds that the Forest Service's actions constituted a taking, as they temporarily deprived Shirl Pettro of his entire property interest. *See Yuba IV*, 821 F.2d at 640; *Skip Kirchdorfer, Inc. v. United States*, 6 F.3d at 1582 ("A 'permanent' taking can have a limited term.... A 'permanent' physical occupation, as distinguished from a mere temporary trespass, involves a substantial physical interference with property rights."). In the instant case, the taking began on January 16, 1996, when plaintiff's contractor was first forced to vacate the Pettro pit and to remove his equipment.[12] By agreement of the parties in the quiet title action, plaintiff's ownership interest ceased from October 3, 1997 until March 5, 1998, so there was no taking during that period. The taking period resumed on March 5, 1998, and continued until the parties' stipulation was entered into on May 21, 1998. Overall, the total period of the taking encompassed 703 days.

The court's holding here is consistent with the opinion of the United States Court of Appeals for the Federal Circuit in the *Yuba II* case, which involved a fact pattern similar to that of the present case. *See generally*, 723 F.2d at 884.[13] In 1905, Yuba Goldfields, Inc. became the owner of precious metal interests in a particular piece of property. *Yuba II*, 723 F.2d at 885. Yuba mined the property continuously until sometime in or about 1975, when the United States Army Corps of Engineers informed Yuba that Yuba had no extraction or other rights, that Yuba

would be held accountable for any further removal of precious metals, that the government would enforce its perceived ownership, and that Yuba's removal of any material was prohibited. *Id.* at 885–86. After negotiations to settle the ownership dispute failed, Yuba sued in a California federal court in 1980 to quiet title and to gain just compensation for a temporary taking. *Id.* at 886.

In the quiet title action, a federal district court granted summary judgment to Yuba, holding that the government's claim to the mineral rights was unsound. *Id.* In the United States Claims Court, on the transferred claim for a temporary taking, the court granted summary judgment to the United States and stated that there was no taking. *Yuba I*, 1 Cl.Ct. at 424. The Claims Court reasoned that the United States did not physically bar Yuba from use of the land, that the government thought in good faith that it owned the mineral rights, and that the government acted in a proprietary rather than sovereign capacity. *Id.* at 424–25.

On appeal, the Federal Circuit, in *Yuba II*, overturned the finding of summary judgment and remanded the case to the Claims Court. 723 F.2d at 891. With respect to whether the government had barred Yuba from the land, the Federal Circuit stated that "[n]either physical invasion nor physical restraint constitutes a *sine qua non* of a constitutionally controlled taking." *Id.* at 887 (citing *Penn Cent. Transp. Co. v. New York City*, 438 U.S. at 104, 98 S.Ct. 2646). The Federal Circuit further characterized the factors of possession and restraint as irrelevant. *Id.* In the present case, as addressed above, the fact that the government physically did not occupy Shirl Pettro's pit is similarly irrelevant. It was clear from the Forest Service's letters

Pettro held no valid property interest from October 3, 1997 through March 5, 1998.

**12.** A plausible argument could be made that the taking actually began on August 24, 1995, when the Forest Service issued its first cease and desist letter to plaintiff. However, plaintiff's post-trial brief states that "[t]here is no testimony in the record that Shirl Pettro sustained any damage by loss of royalties between August 24, 1995 and January 15, 1996, and Shirl Pettro makes no claim for loss during that time period."

**13.** The dispute between Yuba Goldfields, Inc. and the government resulted in six court decisions, three by this court's predecessor, the United States Claims Court, and three by the Federal Circuit. Only the fifth decision in the line of cases, one by the Claims Court, went unpublished. *See generally Yuba Goldfields, Inc. v. United States*, 1 Cl.Ct. 421 (1983) (*Yuba I*); *Yuba II*, 723 F.2d at 884; *Yuba Natural Resources, Inc. v. United States*, 10 Cl.Ct. 486 (1986) (*Yuba III*); *Yuba IV*, 821 F.2d at 638; *Yuba Natural Resources, Inc. v. United States*, 904 F.2d 1577 (Fed.Cir.1990) (*Yuba VI*).

and actions that the government saw itself as the owner of the mineral rights and would not allow any exercise of that right by plaintiff. The government physically never had to bar plaintiff from using the pit because the government contacted the plaintiff and his contractors, and each of the parties, fearing a lawsuit and the potential damages threatened by the government, heeded the government's threats by refraining from challenging the Forest Service's actions outside of legal channels and by refraining from removing sand and gravel from the pit.

With respect to the questions of good faith and proprietary versus sovereign action, the Federal Circuit in *Yuba II* noted a lack of evidence to support the Claims Court's findings on these issues. *Id.* at 889. More important for Shirl Pettro's case, however, is the Federal Circuit's statement that:

> determination of whether the United States has acted in a proprietary or governmental-sovereign capacity is of little, if any, use in Fifth Amendment-just compensation analysis. The purpose and function of the Amendment being to secure citizens against governmental expropriation, and to guarantee just compensation for the property taken, what counts is not what the government said it was doing, or what it later says its intent was, or whether it may have used the language of a proprietor. What counts is what the government *did*. What the government appears to have done here was to prevent Yuba from mining minerals for about six years.

*Id.* at 889–90 (emphasis in original) (citation omitted). This language implies that the government's words—its claim of being the true holder of title to the mineral rights—cannot excuse its actions. In the instant case, the Forest Service abruptly prevented plaintiff from exercising a property right which his family had held without interference for several decades. The government effected a taking by depriving Shirl Pettro of his rights to mine in the pit and to sell the sand and gravel; whether the Forest Service was acting in good faith or believed it held a legitimate claim of ownership is not dispositive on the issue of whether or not a taking occurred.

Despite the above-quoted holding of the Federal Circuit in *Yuba II*, defendant in the present case argues that *DSI Corp. v. United States*, 228 Ct.Cl. 299, 655 F.2d 1072 (1981), even though admittedly factually distinguishable from the present case, implies that governmental assertion of ultimate ownership should be treated differently than an exercise of condemnation. In the *DSI* case, the government brought a foreclosure action in federal court on a second chattel mortgage. 655 F.2d at 1073. After several years of government possession of the subject property, the holders of the first mortgage brought suit claiming they were not paid for the value of the property and, thus, were subjected to a taking. *Id.* at 1074. The Claims Court found no taking, stating:

> [T]here is no authority to hold that an effort by the United States to assert its right to property in a noneminent domain judicial proceeding is itself a taking, and the view that so doing of itself exercised the power of eminent domain would be wholly unwarranted. The government is voluntarily submitting its claim to the scrutiny of the court and impliedly is agreeing to abide by the outcome of the trial. Nor is the decision by the government to hold on to property physically, awaiting the outcome of judicial proceedings a taking.

*Id.* at 1075. This holding, however, was considered by the court in *Yuba II*, and its breadth was limited to the notion that "assertion by the United States of a right in a judicial proceeding is not itself a taking." *See* 723 F.2d at 889. In such a case, the government's filing of a legal claim has not necessarily harmed the other party's interest. The present case is inopposite, however, because actions taken by the government in addition to the court action did affect plaintiff's ownership interest, as he and his contractors were prevented from removing materials from the pit.[14]

---

**14.** Several other decisions have cited the *DSI* holding in a takings context, but each involved a takings claims based on a mortgage foreclosure with no additional governmental action. *See,* *e.g., Shelden v. United States,* 19 Cl.Ct. 247, 251 (1990), *vacated upon reconsideration,* 26 Cl.Ct. 375, 380 (1992), *rev'd,* 7 F.3d 1022, 1026 (Fed.

The government in the case now before this court would have the court treat it simply as a private party asserting a claim of ownership to certain property rights. However, defendant did not act in that manner. The plaintiff notes that defendant could have taken either of two different courses of action. Defendant could have permitted Shirl Pettro to continue mining until the ownership issue was resolved. If the issue was resolved in its favor, the government then could have sought compensation for any lost material. Alternatively, the government could have requested an injunction to prevent any removal of material from the pit while the ownership issue was being resolved. These are the courses of action which would have been available to a private property owner who was attempting to gain title to the mineral rights. Defendant, in contrast, chose neither of these two options, and instead utilized threats backed by its sovereign power to prevent plaintiff from operating in the pit. As the Federal Circuit noted in *Yuba II*, "[T]he United States is not a private party. It imposes penalties, criminal and civil, the threat of which lurks behind government statements like those here involved, regardless of what the government may have intended.... Whether in a property conflict the actions of the government may be equated with those normal to a private citizen is determinable only in light of all the facts." 723 F.2d at 889. Based on the record in this case discussed above, the actions undertaken by the government were not merely equivalent to those of a private citizen when the government ordered the plaintiff and his contractors to cease and desist, or in the alternative to face penalties.

Defendant also raises other defenses which the court finds unconvincing. First, the government argues that no taking could have resulted from the Forest Service's actions because Utah County, with a Notice to Comply dated April 19, 1995, had already prohibited plaintiff from mining. However, plaintiff showed at trial that the issues raised in the Notice were directed largely to the actions of a contractor who had removed himself and offending structures from the Pettro pit by August of 1995. Other concerns directed specifically toward Shirl Pettro, such as the failure to post a business license copy and the failure to submit an approved site reclamation plan, could have been addressed readily to the County's satisfaction. Defendant's expert admitted to this at trial. Furthermore, in 1995, plaintiff had a valid special use permit from the Forest Service and a valid county business license. Thus, the Forest Service's actions and the Forest Service's claim of mineral rights ownership were the only factors preventing plaintiff from pursuing mining activities.[15]

Defendant also argues that no taking should be found when the government pursues its ownership claim in the courts, as it did here by bringing a quiet title suit in federal district court in Utah. Defendant contends that the failure to bring a court action was one of the court's emphasized reasons for finding a taking in the *Yuba II* case. Defendant, however, has misconstrued the court's holding. The Federal Circuit in *Yuba II* did not find that there was or was not a taking, but rather reversed the Claims Court's summary judgment determination. *See* 723 F.2d at 891. According to the Federal Circuit, the Claims Court's decisional grounds were irrelevant to the question of whether Yuba's mineral rights had been taken, the court had not drawn all inferences in Yuba's favor as the non-movant, and there were material questions of fact which could only be resolved with a trial. *Id.* at 887–91; *see also Yuba IV*, 821 F.2d at 639. The Federal Circuit noted that the government's failure to bring legal action was evidence that it had not necessarily acted with the good faith that the Claims Court had ascribed to it. *Id.* at 888–89. Nowhere did the Federal Circuit state that a successful takings claim can be based on the government's failure to seek redress in the courts. Conversely, the court of appeals also did not state that bringing a legal action would insulate the government from liability for a taking. In sum, the

Cir.1993); *Sol–G Constr. Corp. v. United States*, 231 Ct.Cl. 846, 850 (1982).

**15.** Plaintiff did not receive a county business license in 1996 solely because of the title dispute with the Forest Service.

decision in *Yuba II* indicates that the government's use of the courts is not dispositive.

Having established that the Forest Service's actions in the instant case constituted a taking under the Fifth Amendment of plaintiff's property for a finite period, the court must now determine the just compensation to which plaintiff is entitled. "Such compensation means the full and perfect equivalent in money of the property taken. The owner is to be put in as good position pecuniarily as he would have occupied if his property had not been taken." *United States v. Miller*, 317 U.S. 369, 373, 63 S.Ct. 276, 87 L.Ed. 336 (footnotes omitted), *reh'g denied*, 318 U.S. 798, 63 S.Ct. 557, 87 L.Ed. 1162 (1943). "The just compensation for a permanent taking is generally the fair market value of the property taken, whereas the recovery for a temporary taking is generally the rental value of the property." *Bass Enters. Prod. Co. v. United States*, 133 F.3d 893, 895 (Fed.Cir.1998). In the temporary takings situation, rental value is seen as an appropriate measure because the property is returned to the owner when the taking ends, and the government, therefore, should only pay for its use of the property. *See First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. at 319, 107 S.Ct. 2378; *Yuba VI*, 904 F.2d at 1580–81.

Plaintiff argues that, rather than just the rental value of his property, just compensation in this case should include lost profits which he allegedly would have made during the period of the temporary taking. At trial, Shirl Pettro presented evidence that, as of the beginning of the taking period on January 16, 1996, he had two oral agreements for the sale of sand and gravel from his pit. Under one agreement, Mike Dunn was to remove 40,250 tons of material from the pit, paying a royalty of 75 cents per ton. Under the other agreement, Valley Asphalt would mine approximately 200,000 tons of sand and gravel at the same royalty rate. Apart from these agreements, plaintiff also contends that Mr. Dunn would have removed another 75,000 tons, and that the Pettro pit would have supplied the following amounts of gravel for other nearby construction projects in and around the Provo, Utah area: 280,700 tons for a 1997 Provo Airport dike project; 202,000 tons for a 1998 Provo Airport dike project; 535,000 tons for a connector road project; 466,275 tons for a University Avenue Interchange project; and 150,000 tons for a Provo Towne Mall project. At trial, plaintiff presented evidence indicating that the Pettro pit was a strong candidate for use as the gravel source for these projects. Ron Knight, plaintiff's expert, testified that hauling and transportation costs for gravel generally outweigh any concerns about the royalty rate charged by a supplier. Because the Pettro pit was proximally very close to the construction projects listed above, it is not extreme to conclude that contractors would have seriously considered purchasing their gravel from plaintiff.

In the end, however, the court does not agree that just compensation for a temporary taking can or should include lost profits of the type sought by plaintiff. Plaintiff argues that these projects represented an unusually large demand for gravel in the area immediately surrounding his pit. Even if this is true, plaintiff cannot prove that he would have consummated deals for these other projects, nor can he avoid the fact that such a demand "spike" could occur again in the future. It is impossible for plaintiff to establish that these projects represented the only possibility of sales from the Pettro pit. Thus, because the plaintiff retains the sand and gravel, were the court to grant plaintiff recovery for his lost profits, the possibility of a double recovery would be created. As defendant noted in its post-trial brief, "[N]one of [the] proposed projects actually resulted in any aggregate materials being removed from the pit. Every recoverable ton of material is still in the hillside. Still, plaintiff alleges that the proper measure of damages is the royalty never paid on a ton of material never mined."

The plaintiff in the *Yuba* line of cases similarly made a request for lost profits damages based on potential proceeds which could have been realized from the sale of mined gold. *Yuba VI*, 904 F.2d at 1581. The Federal Circuit summarized Yuba's argument:

Yuba argues, however, that it is entitled not just to the fair rental value of the property, but also to the difference between the value of the gold that Placer allegedly would have extracted during the period of the taking and the lower value of the gold after the taking ended and the gold could be mined. The price of gold had increased substantially during the taking period and had dropped significantly thereafter.

*Id.* The Federal Circuit further noted that "[i]t is a well settled principle of Fifth Amendment taking law, however, that the measure of just compensation is the fair value of what was taken, and not the consequential damages the owner suffers as a result of the taking." *Id.* (citing *Kimball Laundry Co. v. United States*, 338 U.S. 1, 7, 69 S.Ct. 1434, 93 L.Ed. 1765 (1949); *United States v. General Motors*, 323 U.S. 373, 380, 65 S.Ct. 357, 89 L.Ed. 311 (1945)). The court went on to reject Yuba's argument, stating that it was "precisely the kind of claim for consequential damages—here, lost profits—that is not an appropriate element of just compensation for the temporary taking of property." *Id.* at 1581–82. Shirl Pettro's claim for lost profits is likewise improper in the present case. As plaintiff has lost no material from the pit during the taking, he theoretically may still profit fully from its sale in the future.

Furthermore, plaintiff's arguments concerning the construction projects—specifically, that the contractors identified would have procured gravel from the Pettro pit—are of a conjectural and speculative nature which the court cannot employ as the basis for an award of damages. At trial, plaintiff attempted to show that, had the Pettro pit been available to supply material, certain contractors would have been able to reduce their bid and secure the contracts. While this theory may be true, it cannot account for the effect which the availability of the Pettro

pit might have had on other bids. For example, knowing that the Pettro pit was available as a source of material, owners of pits located greater distances away from the construction projects might have reduced greatly their per ton asking price for gravel in order to be more competitive. Plaintiff has not accounted for this, nor could he, because such an effect on plaintiff's possible profits cannot be quantified. There are many variables in the bidding process, which inevitably undermine plaintiff's argument.[16]

■ While plaintiff may have lost no material from the pit during the temporary taking, he still was prevented from exercising his mineral rights in the property. The government, for causing this deprivation and temporarily taking Shirl Pettro's property rights, must compensate plaintiff appropriately. The court agrees with defendant that just compensation in this case should be the fair market rental value of plaintiff's property. To determine this fair market value, defendant presented Edwin Moritz as an expert.[17] Mr. Mortiz is a geologist and mineral appraiser with experience in appraising sand and gravel properties. In Mr. Moritz's report, he separated rental value estimation into two distinct phases, a first exploration and evaluation phase and a second production phase. The report stated:

During this first [exploration and evaluation] phase and under a typical contract (lease, rental, option, etc.), the mine operator pays the mineral rights owner considerations such as advanced royalties, bonuses, delay rentals, option payments, and other considerations. These considerations are economic rents. During this period the property is not available to others or to the mineral rights owner himself for competing purposes. It is "held" by the mine operator for the contractual period.

---

**16.** Such variables would not have been present in plaintiff's established sand and gravel purchase agreements with Mike Dunn and Ron Knight. However, as noted earlier, the court will not award lost profit damages for these agreements because no sand and gravel was removed from the pit, and such an award could create the possibility of a double recovery for plaintiff.

**17.** Plaintiff did not present testimony to establish a fair market rental value, choosing instead to pursue his claim for the profits which could have been realized from the local construction projects.

During this first phase practically no materials are removed from the property. The minerals are still in the ground even when this phase ends. . . .

In the second phase (production phase), the activity involves removal and sale of minerals. Therefore, the mineral deposit is being depleted. For allowing the mine operator to remove and sell the owner's minerals the mineral rights owner receives a consideration. . . .

Mr. Moritz concluded that the Pettro pit was in the evaluation stage. He based his conclusion on the facts that, at the time of the taking, (1) plaintiff needed to acquire County regulatory approval to begin mining, and (2) the property was not actively producing gravel. As noted earlier, the court does not agree that there were significant regulatory impediments that stood in the way of plaintiff's mining. Any necessary county licenses could have been obtained readily. However, the court does agree with Mr. Moritz's statement that the pit was not producing. While Mr. Dunn and Mr. Knight had begun preparations for the commencement of mining, no active gravel removal had to be halted at the time of the taking. All of the gravel remains in the pit and can be sold in the future. Thus, the court agrees with defendant's expert's conclusion that the pit was in the exploration and evaluation stage for the purpose of determining a fair market rental value, and that the rental value should be estimated "on basis of advanced royalties, option payments, cash bonuses and delay rentals and *not* on basis of lost royalty income." (Emphasis in original.) The latter basis only would be appropriate if the government in this case had removed material from the pit during the time of the taking and precluded plaintiff from possibly profiting from the sale of the material in the future.

Having concluded that the Pettro pit was in the evaluation phase, Mr. Moritz noted four types of payments which are commonly employed to compensate the pit owner during that phase. These include option payments, cash bonuses, delay rentals and advanced royalties. Option agreements, under which "the mine operator pays some form of upfront cash consideration (option) for the right to explore and evaluate the property, check the market and also to secure the necessary permits for mining," do not appear to be common in Utah, as Mr. Moritz did not find any agreements of this nature. For cash bonus and delay rental payments, Mr. Moritz found these mainly for mining leases on State of Utah lands. These agreements, however, appeared "nominal in nature and not an accurate indicator of economic rents," so defendant's expert did not utilize the agreements in determining a fair market rental value. Agreements with advanced royalties, however, were more common. Mr. Moritz presented evidence from discussions he had with five different sand and gravel purchasing contractors who operate in eastern Utah, and evidence of lease agreements in which parties have removed gravel from state and federal lands in the area. He reasonably used this data to determine the Pettro pit's fair market rental value.

According to the expert's report, "Advance royalties are paid on an annual basis and stipulate minimum cash payments that the mineral rights owner will receive during the evaluation phase regardless of the overall tonnages which ultimately might or might not be produced." Mr. Moritz concluded in his report that advance royalties of anywhere from $1,000.00 to $100,000.00 per year were being paid. Narrowing this range, he further concluded:

> The majority of the advance royalty payments are in the range of $1,000 to $50,000 per year. The high end ($50,000) represents concrete and asphaltic aggregate deposits of high unit value. The Pettro property is considered to fall below the high end of this range given its overall low-quality characteristics and limited end-uses. If we disregard the extreme ends of the total range ($1,000 to $100,000) we can reasonably limit our analysis range for advance royalties to between $5,000 and $50,000 per year.

Mr. Moritz then completed his analysis of the fair market rental value by stating that the Pettro pit's value would lie neither on the high end nor low end of the range. Thus, the expert pinpointed a fair market rental

value at the middle of the range, $27,500.00. Rounding up to the nearest tens of thousands of dollars, he estimated that "advance royalties for the subject property would be $30,000 per year, or $2,500 per month, based on the value pattern expressed by the market."

The court accepts Mr. Moritz's fair market rental value estimation. After reviewing both Mr. Moritz's direct and cross examination, the court concluded that the expert arrived at his figure in a logical manner, and documented his thought process in a step-by-step fashion in the report he supplied to the court. Plaintiff disputed the estimation only insofar as it failed to acknowledge the potential royalties which plaintiff was allegedly going to realize from his oral gravel sale agreements and from the local construction projects. But again, the court notes that such damages would only be recoverable if the gravel actually had been mined. Since the gravel remains in the pit, defendant's expert properly limited his rental value estimation to payments which would have been made for the pit in its evaluation phase. There is nothing in the record which would lead the court to question Mr. Moritz's eventual choice of an advance royalty figure which lies in the middle of a range of values from comparable local agreements.[18] Thus, the court holds that the fair market rental value of plaintiff's mineral rights would have been $30,000.00 per year, $2,500 per month,

or $82.19 per day. Multiplied by the 703 days of the temporary taking, the plaintiff should receive just compensation in the amount of $57,779.57.

Plaintiff also requests that any award of damages include interest from the time of the taking. Determining delay compensation is a factual question and it is a judicial function left to the sound discretion of the trier of fact. See *Studiengesellschaft Kohle v. Dart Indus., Inc.*, 862 F.2d 1564, 1580 (Fed.Cir.1988) (citing *Bio–Rad Labs. Inc. v. Nicolet Instrument Corp.*, 807 F.2d 964, 969 (Fed.Cir.1986), *cert. denied*, 482 U.S. 915, 107 S.Ct. 3187, 96 L.Ed.2d 675 (1987)); *Miller v. United States*, 223 Ct.Cl. 352, 620 F.2d 812, 837 (1980). However, there is a strong judicial policy in just compensation cases which favors establishing uniform interest rates in order to avoid discrimination among litigants. *Hughes Aircraft Co. v. United States*, 31 Fed.Cl. 481, 492 (1994), *aff'd*, 86 F.3d 1566 (Fed.Cir.1996), *vacated on other grounds*, 520 U.S. 1183, 117 S.Ct. 1466, 137 L.Ed.2d 680 (1997); *Miller v. United States*, 620 F.2d at 838. Additionally, it is well-settled that a trial court has discretion on whether to award simple or compound interest. *Rite–Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1555 (Fed.Cir.) (en banc), *cert. denied*, 516 U.S. 867, 116 S.Ct. 184, 133 L.Ed.2d 122 (1995).

---

18. In fact, Mr. Moritz's elimination of the upper end of the range as a fair market rental value figure for the Pettro pit was supported expressly at trial by plaintiff's counsel when counsel disputed the expert's assessment of a fair market sale value for the pit. The following colloquy took place on cross-examination of the witness:

Q. On the last paragraph of page 47 [of the expert report], sir, you state in the second sentence on the last paragraph, "Due to the poor quality of the aggregate from the subject property, it has been determined that this material could potentially only meet the specifications for the major end use categories of fill and road base coverings." Did you write that?

A. Yes.

Q. Now you recognize, since you've been here throughout the trial, that [a respected standards body] recognizes 20 or 21 of your test pits [in the Pettro pit] in this case to be good to excellent sand and gravel.

A. Good to excellent sand and gravel.

Q. Yes?

A. Yes. Certainly.

Q. And sir, is the word poor quality meant as an advocacy word? Could it just as easily be the "good to excellent sand and gravel in this pit"?

A. The context of that was, we were comparing to higher end uses such as concrete and bituminous aggregates.

Q. Mr. Moritz, you realize, do you not, sir, that our claim has not been for higher end aggregates and road base. Our claim has been for borrow jobs, dike jobs, that require good to excellent sand and gravel.

A. Certainly, yes.

\* \* \* \* \* \*

Q. But the truth is that for purposes of this case, [ ] Shirl Pettro doesn't sell road base and aggregate materials that go into asphalt, he sells borrow material, fill material, and dike material, that really this is an excellent pit for that. Isn't that true?

A. Yes.

In general, interest on a claim against the United States is allowed with a judgment by the Court of Federal Claims only under a contract or if expressly provided for by an Act of Congress. *See* 28 U.S.C. § 2516(a) (1994). However, an exception to this rule arises when a taking entitles a claimant to just compensation under the Fifth Amendment. *United States v. Alcea Band of Tillamooks*, 341 U.S. 48, 49, 71 S.Ct. 552, 95 L.Ed. 738 (1951); *Whitney Benefits, Inc. v. United States*, 30 Fed.Cl. 411, 414 (1994). Thus, plaintiff is entitled to interest computed from the date of the taking to the date of payment by defendant. *See Formanek v. United States*, 26 Cl.Ct. 332, 341 n. 11 (1992). Moreover, compound interest may be necessary "to accomplish complete justice" under the just compensation clause of the Fifth Amendment. *Dynamics Corp. of Am. v. United States*, 766 F.2d 518, 520 (Fed.Cir.1985). The court holds that the interest in this case should be compounded because plaintiff's mineral rights, had they been available to him, would have been used for commercial purposes to produce income. *See Whitney Benefits, Inc. v. United States*, 30 Fed.Cl. at 415–16 ("Income-producing property would generate an income stream that would be available for continual reinvestment, at compound rates. Just compensation requires the payment of compound interest to replace the investment opportunities plaintiffs lost when the government took their property."); *ITT Corp. v. United States*, 17 Cl.Ct. 199, 240 (1989).

Congress has approved 1–year Treasury Bill rates for pre-judgment interest in land condemnation cases in the Declaration of Takings Act, 40 U.S.C.A. § 258e–1 (West 1994 & Supp.1998), for post-judgment interest in district court actions, 28 U.S.C. § 1961(a) (1994), and for post-judgment interest in later-affirmed non-tax cases before the United States Court of Federal Claims, 28 U.S.C. §§ 2516(b), 1961(c)(3) (1994). The court concludes that 1–year Treasury Bill rates should be used as a reasonable rate of return for the purposes of delay compensation in this case. These rates account for inflation while avoiding a reward for risks which the plaintiff did not undertake.

### CONCLUSION

After thoroughly reviewing the record and carefully considering the arguments offered by both parties, the court holds that the defendant effected a temporary taking of plaintiff's mineral rights when it prevented plaintiff from exercising those rights for two periods of time spanning 703 days. The plaintiff is entitled to the fair market rental value for the period of the taking, which the court holds to be $2,500.00 per month, plus compounded interest calculated using rates of return equal to those of 1–year Treasury Bills which could have been purchased during the taking.

Upon issuance of this decision and in accordance with its conclusions, the parties jointly shall prepare for the court a computation of the rents and applicable interest due. This schedule should detail the 1–year Treasury Bill rates used for calculating the delay compensation during the period of the temporary taking. At the conclusion of the computation, the parties shall submit a calculation for the final resolution of this case, and the date upon which it will become effective. This joint report shall be due on or before Tuesday, August 8, 2000.

**IT IS SO ORDERED.**